**IN THE COURT OF APPEALS OF IOWA**

No. 24-1534
Filed December 18, 2024

**IN THE INTEREST OF A.H.,**
**Minor Child,**

**B.H., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Jones County, Joan M. Black, Judge.

A mother appeals the juvenile court's order terminating her parental rights to her child. **AFFIRMED.**

Robin L. Himes, Linn County Advocate, Cedar Rapids, for appellant mother.

Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney General, for appellee State.

David G. Baumgartner, Strawberry Point, attorney and guardian ad litem for minor child.

Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**AHLERS, Judge.**

This family was on the radar of the Iowa Department of Health and Human Services due to events occurring in late July 2022. Those events involved the mother punching her ex-boyfriend while in the presence of her child (born in 2018) and then, after consuming significant amounts of alcohol, driving with the child in her vehicle and threatening to drive the car into a ditch to kill them both.

While these events were being investigated, juvenile court involvement became necessary in August when the mother, who was driving with the child in the car, was involved in a head-on collision. Medical staff at the local emergency room requested to transport the injured child to University of Iowa Hospitals and Clinics (UIHC). The mother—observed by hospital staff to be exhibiting signs of methamphetamine use—refused to authorize transport or medical care for the child. The mother was escorted from the hospital by law enforcement after she threatened to punch hospital staff in the face. The child was flown to UIHC by an air ambulance. When the mother arrived at UIHC, she was contacted by a worker from the department. The mother, referring to staff at the local hospital, expressed regret at not having assaulted the staff, saying, "I should have punched that bitch when I had the chance." Subsequent drug testing revealed that the mother was positive for methamphetamine and marijuana, and the child tested positive for methamphetamine.

The August events resulted in a founded child abuse assessment against the mother. They also caused the juvenile court to remove the child from the parents' custody and grant custody to the department. The department placed the

child with the child's maternal aunt. The juvenile court adjudicated the child as in need of assistance (CINA).

As the CINA case progressed, the juvenile court authorized two separate trial-home visits with the mother. Both were terminated prematurely—one in April 2023 due to illegal drugs found in the mother's residence[1] and the other in October due to the mother striking the child in the face as a form of discipline. Sandwiched between the two trial-home visits was a permanency order giving the mother an additional six months to work toward reunification. *See* Iowa Code § 232.104(2)(b) (2022).

After the second trial-home visit failed, the mother again tested positive for methamphetamine, at which point she stopped submitting to drug testing for several months. The State filed a petition seeking to terminate the parents' parental rights. After the termination trial was completed in February 2024, the juvenile court twice reopened the record at the mother's request and held additional hearings in April and July. Following the three hearings, the juvenile court terminated the parents' rights to the child. Only the mother appeals.

## I.   Standard and Process of Review

We review orders terminating parental rights de novo. *In re Z.K.*, 973 N.W.2d 27, 32 (Iowa 2022). Our review follows a three-step process of determining (1) whether a statutory ground for termination has been established, (2) whether termination is in a child's best interests, and (3) whether a permissive

---

[1] Drug testing of the child after the termination of the first trial-home visit showed the child testing positive for THC metabolites. These events resulted in two additional founded child abuse assessments against the mother.

exception should be applied to preclude termination. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). We do not address any step not challenged by a parent. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

The mother purports to challenge all three steps. However, because her challenge to the second and third steps are intertwined such that it is based entirely on the third step, we limit our discussion on that part of her challenge to the third step. As a result, we address the first and third steps only.[2]

## II.    Statutory Grounds

The juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(f). Termination is permitted under that ground upon clear and convincing proof that the child (1) is at least four years old, (2) has been adjudicated CINA, (3) has been removed from the parent's custody "for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days," and (4) the child cannot be safely returned to the parent's custody at the time of the termination hearing. Iowa Code § 232.116(1)(f); *see also In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (defining "at the present time" to mean at the time of the termination trial). The mother challenges only the fourth element.

After our de novo review, we agree with the juvenile court that the child could not be returned to the mother's custody. To the mother's credit, she had

---

[2] Although the mother makes a passing reference to requesting additional time to work toward reunification in her petition on appeal, she cited no authority and made no substantive argument in support of this claim, so we deem the issue waived. *See* Iowa R. App. P. 6.903(2)(a)(8)(3); *In re B.D.*, No. 23-0105, 2023 WL 2671958, at *1 (Iowa Ct. App. Mar. 29, 2023) (concluding sprinkled references to issues without properly identifying and developing them waives the issues).

stable housing and consistent employment, and she had also largely addressed her substance-use issues.  But concerns remained.

The concerns included the mother's refusal to be accountable for the family's situation.   For example, despite multiple positive tests for methamphetamine, the mother adamantly claimed she'd never used methamphetamine in her life, but she had no credible explanation for why she and the child tested positive for the drug.  As another troubling example, the mother continued to blame others for the removal of the child.  This included blaming the child for reporting the physical abuse that caused the second trial-home visit to end.  The mother not only expressed this blame to the department and the juvenile court, but directly to the child during supervised visits.  The mother told the child, "Because you fucking lied and got your wish.  You get to live with [your aunt] now." The mother went on to tell the child that the child had lied and that "no one hit her in [the] fucking face." Another time, after the mother tapped the child on the bottom during a visit, the child complained that the mother had spanked her.  In response, the mother said, "I tapped you.  Don't exaggerate.  That's why we are in this situation we are fucking in."

Concerns also included the mother repeatedly yelling and cursing at the child during visits.  The mother also regularly engaged in discussions of improper topics with the child during visits.  She told the child the department workers were "terminating" the mother and that they weren't allowed to have others at visits because the workers didn't want them to have any fun.  The mother referred to the child's father by a derogatory, profanity-laced name.

The mother also bad-mouthed the child's aunt with whom the child is placed. The mother framed the issue to the child as there are sides—meaning either the mother's or the aunt's side—and the child has to decide which one the child is on. This has distressed the child and caused her to try to defend the aunt.

Concerns also swirl around the mother's choice of romantic partners. The mother has a history of being involved with men with significant criminal issues, substance-use issues, or both, and she has been less than forthcoming about those relationships. During the course of the CINA case, the mother began dating a man on the sex-offender registry for a crime against a child. To her credit, when the relationship was finally discovered by the department and the man's sex offense was pointed out to the mother, she ended the relationship. But the fact remains that it took the efforts of others to vet her paramour, which does not inspire confidence in the mother's ability to provide a safe environment for the child if the mother is left unsupervised.

The mother has also been manipulative and cagey about a new man in her life—a man who lives in her apartment complex and has children of his own. The mother hid the relationship from the department and the juvenile court for many months. While still hiding the relationship and knowing she could not have others at visits, especially individuals who had not been subject to a background check, the mother arranged for the man and his children to be playing at the park at the same time she had visits with the child in the park so the mother and child could interact with him.

When the relationship was finally discovered, the department's preliminary background check of the man uncovered concerns. The concerns included a

history of substance use and domestic violence, so the department requested that he submit to a drug test. Before the department could arrange the test, the mother informed the department that she and the man were no longer in a relationship, so the department canceled the test.

The report that the mother and the man had broken up turned out not to be true. The mother testified at the final day of the termination trial that the man was her fiancé and they had been dating for nine months—a period that covered when the man was appearing at visitation without a background check, when she testified at the first day of trial that she was not dating anybody, and when his drug test was canceled after she told the department they were no longer in a relationship. It also came out that the man had been introduced to the child as the mother's fiancé and that the mother and child would be moving in with him.

The record establishes that the mother made progress in reducing the number of times she cursed and yelled at the child during visits, and we give her credit for that progress. But we cannot ignore the negative impact the mother's overall conduct has had and continues to have on the child. When supervision of visits was relaxed or the mother received increased time with the child, the child's negative behaviors increased. The child has confided in department workers that she feels guilty about her removal from the mother's home. The juvenile court appropriately concluded that the child has nothing to feel guilty about but does so because of the inappropriate comments the mother has repeatedly made to her.

Following our de novo review of the record, we agree with the department's decision to not permit the mother to move past fully-supervised visits. The mother's inability to progress beyond fully-supervised visits means the child cannot

be returned to her custody. *See In re S.L.*, No. 19-0107, 2019 WL 1055689, at *2 (Iowa Ct. App. Mar. 6, 2019) (finding a child cannot be returned to a parent's custody when the parent has failed to progress past fully supervised visits); *see also In re J.H.*, 952 N.W.2d 157, 170 (Iowa 2020) ("[T]here is a substantial difference between meeting a child's needs under the supervision and guidance of other people and being able to independently care for a child . . . ."). The mother's continued failure to accept responsibility for the child's removal, her continued placing of blame on the child's shoulders, her undermining of the department's efforts, and her manipulation of the department in efforts to bring a potentially unsafe person into her child's life convinces us that returning the child to the mother's custody would subject the child to additional emotional and mental injury or trauma. *See* Iowa Code § 232.96A(3)(a) (defining a child in need of assistance to include a child who is imminently likely to suffer harmful effects as a result of mental injury caused by the acts of the child's parents); *see also In re M.M.-P.*, No. 24-1279, 2024 WL 4502878, at *3 (Iowa Ct. App. Oct. 16, 2024) (holding a child cannot be returned to a parent's custody if doing so would expose the child to "any harm amounting to a new child in need of assistance adjudication or without remaining a child in need of assistance" (quoting *In re S.C.*, No. 15-0262, 2015 WL 2089743, at *2 (Iowa Ct. App. May 6, 2015))). We conclude the State established statutory grounds for termination of the mother's parental rights.

## III. Permissive Exception—Closeness of Parent-Child Relationship

When statutory grounds for termination exist, the juvenile court can still decline to terminate parental rights if it finds one of the exceptions in Iowa Code section 232.116(3) applies. Application of one of the exceptions is permissive, not

mandatory, and the parent claiming the exception has the burden to prove applicability of the exception. *In re A.S.*, 906 N.W.2d 467, 475–76 (Iowa 2018).

The mother asserts the exception in section 232.116(3)(c) should be applied to avoid termination. That exception permits the court to deny termination when the parent presents clear and convincing evidence "that termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c).

There is no dispute that the mother loves the child and there is a strong bond between the two. There is competing evidence as to whether severance of that close bond by termination would be detrimental to the child. After our de novo review, we conclude that the child's need for stability—which is being provided in her current placement—outweighs any harm that may result from termination of the mother's rights. We echo the juvenile court's conclusion that

> any potential harm to the child from the loss of her parents will be ameliorated by placement in a safe, loving, permanent adoptive family. In fact, the harm for this child would be if she were removed from her current placement and deprived of the stability that has been provided to her.

The mother has failed to establish a permissive exception to termination.

## IV. Conclusion

As the State established statutory grounds for termination, and the mother failed to meet her burden of establishing that a permissive exception to termination should be applied, we affirm the juvenile court's decision to terminate the mother's parental rights.

**AFFIRMED.**